Slip Op. 17-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLARWORLD AMERICAS, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 15-00232** |
| **and** | |
| **JINKO SOLAR IMPORT & EXPORT CO., LTD. ET AL.,** | |
| **Defendant-Intervenors.** | |

<u>**OPINION**</u>

[Sustaining the remand results issued by the U.S. Department of Commerce concerning its final determination in the first administrative review of the countervailing duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: June 7, 2017

<u>Timothy C. Brightbill</u> and <u>Laura El-Sabaawi</u>, Wiley Rein, LLP, of Washington, DC, for plaintiff.

<u>Justin Reinhart Miller</u>, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of New York, NY, for defendant. With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of Counsel on the brief was <u>Lydia Caprice Pardini</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Neil R. Ellis</u>, <u>Richard L.A. Weiner</u>, <u>Rajib Pal</u>, <u>Shawn Michael Higgins</u>, and <u>Justin Ross Becker</u>, Sidley Austin, LLP, of Washington, DC, for defendant-intervenors.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Commerce" or "Department") remand redetermination in the first administrative review of the countervailing duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China"), filed pursuant to the court's order in SolarWorld Americas, Inc. v. United States, 40 CIT __, 181 F. Supp. 3d 1372 (2016) ("SolarWorld I").  Final Results of Redetermination Pursuant to Remand, Jan. 18, 2017, ECF No. 49-1 ("Remand Results"); see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 80 Fed. Reg. 41,003 (Dep't Commerce July 14, 2015) (final results of countervailing duty administrative review; 2012) and accompanying Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, C-570-980, (July 7, 2015), ECF No. 21-2 ("Final Decision Memo"); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order).  For the reasons that follow, Commerce's Remand Results adequately address the concerns raised in the court's prior opinion, are supported by substantial evidence, and are in accordance with law.  The Remand Results are therefore sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in full in the previous opinion ordering remand to Commerce,  see SolarWorld I, 40 CIT at __, 181 F.

Supp. 3d at 1374–75, and here recounts the facts relevant to the court's review of the

Remand Results.

In the underlying countervailing duty ("CVD") investigation covering crystalline

silicon photovoltaic cells, whether or not assembled into modules, from China, Commerce

determined that the Government of China provided a countervailable subsidy through its

Export-Import Bank in the form of loans at preferential rates for buyers of goods used in

certain energy projects, including solar cells, for export from China ("Export Buyer's Credit

Program").  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the People's Republic of China, 77 Fed. Reg. 63,788, 63,789 (Dep't

Commerce Oct. 17, 2012) (final affirmative CVD determination); see Final Decision Memo

at 33.  In the investigation, Commerce applied adverse facts available ("AFA")[1] to select

a rate of 10.54 percent for this program, corresponding to the highest rate calculated for

the identical program in another CVD proceeding for the same country, as no rate was

calculated for a cooperating respondent for the identical program within this proceeding.[2]

Issues and Decision Memorandum for the Final Determination in the Countervailing Duty

Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

---

[1] Commerce uses the phrase "adverse facts available" or "AFA" to refer to its use of facts otherwise available and the subsequent application of adverse inferences to those facts, pursuant to 19 U.S.C. § 1677e(a)–(b); 19 C.F.R. § 351.308(a)–(c) (2014).  See, e.g., Final Decision Memo at 13–20, 32–33, 42–44, 57–59.

[2] According to Commerce's AFA hierarchy methodology, in investigations Commerce will rely on, in order of preference: the highest non-zero rate calculated for the identical program in the investigation; the highest non-de minimis rate calculated for the identical program in another proceeding involving the same country; the highest non-de minimis rate calculated for a similar program in another proceeding involving the same country; or, finally, the highest rate calculated for any non-company specific program that the industry subject to the investigation could have used.  Remand Results 4.

Modules, from the People's Republic of China at 64, C-570-980, (Oct. 9, 2012), available

at http://ia.ita.doc.gov/frn/summary/prc/2012-25564-1.pdf (last visited June 2, 2017).

On February 3, 2014, Commerce initiated the first administrative review of the CVD

order covering subject merchandise entered during the period of March 26, 2012 through

December 31, 2012.   Initiation of Antidumping and Countervailing Duty Administrative

Reviews and Request for Revocation in Part, 79 Fed. Reg. 6,147, 6,149–57 (Dep't

Commerce Feb. 3, 2014).   In the final determination of the first administrative review,

Commerce again applied AFA to the Export Buyer's Credit Program.[3]   Final Decision

Memo at 14, 33, 43–44.   Commerce applied an AFA rate of 5.46 percent to the Export

Buyer's Credit Program,[4] a rate which corresponds to the highest rate calculated for a

similar program in this proceeding.[5]   Id. at 44.

---

[3] Although respondents reported not using the Export Buyer's Credit Program during the POR, Commerce was unable to verify the reported non-use of the program.  Final Decision Memo at 33.  If, in the course of a CVD proceeding, an interested party or any other person provides information to Commerce that cannot be verified, Commerce shall use facts otherwise available in making its determination, 19 U.S.C. § 1677e(a)(2)(D), and may apply an adverse inference in selecting from among the facts otherwise available where it determines that the interested party did not cooperate fully with its request for information.  19 U.S.C. § 1677e(b).  Here, Commerce found that the Government of China failed to provide information sufficient to verify the respondents' reported non-use of the subsidy program, and that the Government of China did not cooperate fully to comply with the agency's requests for information.  Final Decision Memo at 43–44.  Accordingly, Commerce relied on adverse facts available to determine that the respondents did benefit from the Export Buyer's Credit Program during the period of review.  Id.

[4] The 5.46 percent was the rate calculated in this review for the Preferential Policy Lending to the Renewable Energy Industry program, a subsidy program determined by Commerce to be similar to the Export Buyer's Credit Program.  Final Decision Memo at 44.

[5] As discussed in detail below, according to Commerce's AFA hierarchy methodology, in reviews Commerce relies on, in order of preference: the highest non-de minimis calculated rate for the identical program in the same proceeding; the highest non-de minimis calculated rate for a similar program in the same proceeding; the highest non-de minimis calculated rate for the identical program in another proceeding involving the same country; the highest non-de minimis calculated rate for a similar program in another proceeding involving the same country; or, finally, the highest calculated rate for any program from the same country that the industry subject to the proceeding could have used.  See Remand Results 5; Final Decision Memo at 14.

Plaintiff, SolarWorld Americas, Inc. ("SolarWorld"), moved for judgment on the agency record, challenging Commerce's determination in the first administrative review.[6]  See SolarWorld's Mot. J. Agency R., Feb. 12, 2016, ECF No. 24.  Specifically, SolarWorld challenged as unsupported by substantial evidence and otherwise contrary to law Commerce's determination to countervail the Export Buyer's Credit Program at an AFA rate of 5.46 percent in the review, contending that Commerce selected the rate using an AFA methodology that unreasonably differs from the methodology the agency uses in investigations.  Br. Supp. Pl. SolarWorld Americas, Inc.'s Rule 56.2 Mot. J. Agency R. 9–20, Feb. 12, 2016, ECF No. 24.  Defendant responded that Commerce followed its practice of selecting an AFA rate to apply in administrative reviews.  Def.'s Opp.'n Pls.' Mot. J. Admin. R. 8–18, May 10, 2016, ECF No. 26.  The court remanded to Commerce to clarify or reconsider, as appropriate, its AFA rate selection hierarchy as applied in this administrative review.  SolarWorld I, 40 CIT at __, 182 F. Supp. 3d at 1375, 1381.  Commerce published the Remand Results on January 18, 2017.  See generally Remand Results.

SolarWorld argues that on remand Commerce has failed to explain why its different AFA rate source selection methodology in investigations and reviews is reasonable, and has not supported its determination to countervail the Export Buyer's Credit Program at an AFA rate of 5.46 percent in this review.  Pl. SolarWorld Americas Inc.'s Resp. to Final Results of Redetermination Pursuant to Remand 4–9, Feb. 24, 2017, ECF No. 53

---

[6] Plaintiff commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a (2012).  See Summons, Aug. 12, 2015, ECF No. 1.

("SolarWorld Remand Comments").   Defendant responds that the Remand Results

provide a reasonable explanation for Commerce's different AFA rate source selection

methodologies in investigations and reviews.   Def.'s Resp. to Comments the Remand

Redetermination 9–12, Apr. 24, 2017, ECF No. 56.[7]

## STANDARD OF REVIEW

The court has jurisdiction pursuant to Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012),[8] which grant the court authority to

review actions contesting the final determination in an administrative review of a

countervailing duty order.   "The court shall hold unlawful any determination, finding, or

conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law."   19 U.S.C. § 1516a(b)(1)(B)(i).   "The results of a

redetermination pursuant to court remand are also reviewed 'for compliance with the

court's remand order.'"   Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __,

__, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United

States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

The court remanded to Commerce for further explanation or reconsideration of the

agency's different AFA rate selection practices in investigations and reviews, in the

context of the selection of an AFA rate for the countervailable Export Buyer's Credit

---

[7] Defendant-Intervenors support the arguments presented in Defendant's response to Plaintiff's comments on remand.  See Reply Def.-Intervenors Jinko Solar Co., Ltd., Jinko Solar Import and Export Co., Ltd., and JinkoSolar International Limited to SolarWorld Americas, Inc.'s Comments on the Remand Redetermination 1, Apr. 24, 2017, ECF No. 57.

[8] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Program in this first administrative review.  SolarWorld I, 40 CIT at __, 182 F. Supp. 3d

at 1375, 1381.   On remand Commerce provided further explanation of its AFA rate

selection hierarchy practices, in general and as applied in this review, stating that the

methodologies differ because less information is generally on the record in an

investigation than in a review, requiring the agency to shift its methodology in order to

achieve a rate with appropriate accuracy and inducement in investigations.  See Remand

Results 4–9.  For the reasons that follow, Commerce's explanation is reasonable and

complies with the court's order.

During a CVD proceeding, Commerce may select a rate with which to countervail

a subsidy program by applying an adverse inference from among the facts otherwise

available where it "finds that an interested party has failed to cooperate by not acting to

the best of its ability to comply with [its] request for information."  19 U.S.C. § 1677e(b).

When applying an adverse inference, Commerce may rely on information derived from

any stage of the proceeding, including the petition, a final determination in the

investigation, any previous review, or any other information placed on the record.  Id.

§§ 1677e(b)(1)–(4); 19 C.F.R. §§ 351.308(c)(1)(i)–(iii) (2012).[9]

Commerce has considerable discretion to develop a methodology for calculating

an AFA rate derived from one of the sources listed in the statute to countervail a subsidy

program, as neither the statute nor the regulations dictate how Commerce is to determine

the AFA rate.  See 19 U.S.C. §§ 1677e(b)(1)–(4); 19 C.F.R. § 351.308(c)(1).  The statute

does not require Commerce to favor any single source from among the list of possible

---

[9] Further citations to Title 19 of the Code of Federal Regulations are to the 2012 edition.

sources on which it could base its adverse inference.  <u>See</u> 19 U.S.C. §§ 1677e(b)(1)–(4).

An AFA rate selected by Commerce must reasonably balance the objectives of inducing

compliance and determining an accurate rate.   <u>See</u> <u>F.lli De Cecco di Filippo Fara S.</u>

<u>Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Commerce developed different methodologies for selecting an AFA rate to

countervail a subsidy program in administrative reviews and investigations.  In reviews, if

another cooperating company in the proceeding used the identical program, Commerce

applies the highest non-de minimis rate calculated for a cooperating company for the

identical program in the same proceeding.[10]  Final Decision Memo at 14; Remand Results

5.  In the absence of a usable rate for the identical program in the same proceeding,

Commerce applies the highest non-de minimis rate calculated for a cooperating company

for a similar program in the same proceeding.  Final Decision Memo at 14;  Remand

Results 5.  In the absence of such a rate, Commerce applies the highest non-de minimis

rate calculated for a cooperating company for an identical program in a different CVD

proceeding (<u>i.e.</u>, involving a different industry) for the same country.  Final Decision Memo

at 14; Remand Results 5.  In the absence of such a rate, Commerce uses the highest

non-de minimis rate calculated for a cooperating company for a similar program in a

different proceeding for the same country.  Final Decision Memo at 14; Remand Results

5.  Finally, in the absence of such a rate, Commerce uses the highest rate calculated for

---

[10] This methodology applies to subsidy programs not involving income tax exemptions and reductions.  Final Decision Memo at 14.

any non-company specific program from the same country that the industry subject to the proceeding could have used.  Final Decision Memo at 14; Remand Results 5.

In investigations, if another cooperating company in the proceeding used the identical program, Commerce applies the highest non-zero rate (even if de minimis) calculated for a cooperating company for the identical program in the same proceeding. Remand Results 4.  If no other cooperating company in the investigation used the identical program, instead of applying a rate calculated for a cooperating company for a similar program in the same proceeding as in reviews, Commerce applies the highest non-de minimis rate calculated for an identical program in a different CVD proceeding involving the same country.  Id.  In the absence of such a rate, Commerce uses the highest non-de minimis rate calculated for a similar program in a different CVD proceeding involving the same country.  Id.  Finally, in the absence of such a rate, Commerce uses the highest rate calculated for any non-company specific program from the same country that the industry subject to the investigation could have used.  Id. Therefore, while in reviews, Commerce's second alternative is to apply a rate for a similar program from a company in the same proceeding (i.e., the same industry), the second alternative in investigations is to apply a rate for the identical program in a different proceeding.  In SolarWorld I, the court sought further explanation or reconsideration of the different hierarchies for these seemingly similar situations.  SolarWorld I, 40 CIT at __, 181 F. Supp. 3d at 1376, 1380–81.

On remand Commerce explained that, in both investigations and reviews, the agency seeks a rate which serves its "dual goals" of relevancy and inducing respondents'

cooperation.  Remand Results 5–7, 9.  Commerce achieves relevancy by seeking an AFA

rate that best approximates how the non-cooperating respondent likely used the subsidy

program.   Within relevancy, Commerce seeks both program relevancy (i.e., a rate

reflective of a company using the identical program) and industry relevancy (i.e., a rate

reflective of a company in the same industry), which both inform an accurate rate.

Commerce seeks to induce cooperation by ensuring that a non-cooperating respondent

does not receive a more favorable rate for the program under AFA than it would have

received had the company cooperated.  See id. at 7.  Thus, Commerce's AFA rate

selection hierarchy attempts to balance three variables: inducement, program relevancy,

and industry relevancy.  Id. at 6–7.

     As a general rule, absent a usable rate for a cooperating company within the

industry for the identical program, the agency prefers to weigh industry relevancy more

heavily than program relevancy.  See Remand Results 6.  Commerce explained that it

considers rates for similar programs within the same industry to be more relevant and

thus preferable to rates for the identical program in a different industry.  Its preference for

industry relevancy over program relevancy stems from two assumptions: 1) that subsidy

programs conferring similar benefits will likely be used similarly by companies in the same

industry, and 2) that companies in different industries will likely use the same subsidy

program differently.  Id.  The agency's AFA selection hierarchy for reviews, in which

Commerce selects a rate for a similar program in the same industry, if available, reflects

this preference.  See id. at 4–5.  Further, with each subsequent review, more rates are

available and therefore the risk of choosing a lower rate (and sacrificing inducement)

diminishes.  Id. at 8, n.22.  It is discernible from Commerce's explanation that Commerce considers its review methodology to better balance its dual goals of relevancy and inducement.  Id. at 6–7.  Therefore, in reviews, Commerce will apply a rate from a similar program in the same proceeding before a rate from the identical program in a different proceeding.

However, in investigations, Commerce diverts from its preference for industry relevancy to focus on program relevancy out of a concern that the agency will have few relevant industry rates available at that stage of the proceeding.  Remand Results 7. Commerce's investigation methodology is therefore an exception to its preferred practice. The exception appears rooted in the agency's recognition that its preference for industry relevancy may lead it towards unrepresentative rates in investigations, since it may not have sufficient rates for the industry during an investigation to choose a representative rate that is nonetheless high enough to induce cooperation.  See id. at 7–8.  Commerce explained:

> In many recent CVD investigations, the Department has exercised its discretion under [19 U.S.C. §1677f-1(e)(2)] to limit its examination to two or three producers or exporters, or has only had a few available respondents to examine. Thus, if one producer or exporter is uncooperative, there are only one or two other companies that might have used a similar program, and perhaps each has used the similar program only once or twice. This leaves very few observations from which the Department may "adversely" infer usage of the program, and thus the possibility arises that limiting the pool of proxy rates to within the proceeding will mean choosing a rate that is too low.  Moreover, by "similar program," the Department refers to a program with the same type of benefit, as defined under 19 C.F.R. § 351.504 through 19 C.F.R. § 351.520. Thus, a grant would be similar to another grant; a loan subsidy to another loan subsidy; etc. The Department does not look at the "next most similar program." Thus, in choosing an AFA rate for a loan program, for example, the Department limits itself to the rates calculated under other loan programs. This limitation on the number of

> relevant rates that might be available for an AFA rate (a limitation that is
> necessary to maintain relevancy) further increases the odds that an
> insufficiently low rate will be selected if the Department confines itself to a
> single segment (i.e., the investigation) in selecting an AFA rate.

Remand Results 8, n.22.  Therefore, the agency considers it likely that it will lack sufficient

industry rates to make a selection that serves its goals of relevancy and inducement.

Commerce explained that, when it lacks sufficient information about the industry, "there

is little to be gained by continuing to give weight to an industry-specific proxy rate for that

program."  Id. at 8.  Essentially, the difference between the two practices is that in

investigations Commerce foregoes attempting to find a rate for a similar program in the

same proceeding.  It is discernible that Commerce believes there is a smaller benefit to

relying on rates from the industry in investigations than in reviews.  That smaller benefit

is diminished further by the potential effect on inducement: with fewer rates from which to

choose, it is more likely that there will be fewer high rates with which to induce

cooperation.[11]

The court cannot say that this logic is unreasonable.  It is discernible that

Commerce believes its ability to capitalize on industry relevancy is more limited in

investigations than in reviews.  With fewer available rates, Commerce has a reasonable

concern the available rates may not be relevant to the program at issue, and may be too

low to induce compliance.  Therefore, Commerce's investigation methodology favors

program relevancy, using a rate for the identical program from a different industry.  See

Remand Results 7–8.  Commerce has acknowledged that different industries may use

---

[11] For a review, Commerce expects to have more industry rates from which to choose, and therefore a higher likelihood that there will be a more relevant industry rate and a higher likelihood of a higher rate to induce cooperation.  See Remand Results 8, n.22.

the same subsidy program differently, such that a rate calculated for a company in a different industry may not be representative of the subsidization experience of the respondent company.  Id. at 6.  However, Commerce has chosen to offset the loss of industry relevancy with greater inducement in investigations.  Commerce has adequately explained its different methodologies for investigations and reviews.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

       SolarWorld's counterarguments are unavailing.  SolarWorld argues that the review methodology is unfair as applied here during a first administrative review.  SolarWorld Remand Comments 6.  SolarWorld contends that Commerce has not explained why the "limited additional information" on the record in a first review "necessarily justifies a shift in [the agency's] focus."  Id.  The shift to which SolarWorld refers is the shift from program relevancy in investigations to industry relevancy in reviews.  Implicit in this argument is that the investigation methodology—that is, choosing a rate with program relevancy over a rate with industry relevancy—should be applied in reviews as well.  SolarWorld's conception of the investigation methodology as the standard by which the review methodology is measured reveals the root of the parties' disagreement.  It is discernible in Commerce's explanation that the review hierarchy, favoring industry relevancy, is the agency's preferred methodology.  Remand Results 6–7.  This preference stems from Commerce's position that companies in the same industry will use similar programs similarly while companies in different industries will likely use similar programs differently, but that the agency may not have enough information on the industry during the investigation to select a representative industry rate.  Id. at 6.  Although the

reasonableness of the investigation hierarchy is not before the court, it is plausible that

Commerce may not have enough information at the beginning of the proceedings to be

able to capitalize on industry relevancy, and that it will have more data on the record in

later stages of the proceeding to know more about the industry when calculating rates.

Therefore, SolarWorld's argument that the review methodology is unreasonable because

it differs from the investigation methodology is unpersuasive.

SolarWorld also argues that Commerce's logic that the presence of more rates on

the record in reviews justifies switching the methodology is untenable during a first review,

when only a few rates may be added to the record following the investigation.  SolarWorld

Remand Comments 6.  As discussed above, it is discernible that Commerce considers

its review methodology preferable.  It is reasonable to apply the preferred methodology

as soon as possible in the proceeding, as doing so would enable the agency to benefit

from applying a more-representative industry rate rather than a program rate.  Commerce

has made the policy decision to make that switch at the first review.  Although Commerce

does not provide a certain number of rates that it considers sufficient to enable the

selection of a representative industry rate, there should be more rates on the record in

the first review than in the investigation.  See Remand Results 8, n.22.

Relatedly, SolarWorld argues that Commerce has not explained why it was

reasonable in this case to select an industry-specific rate in the review, when that same

rate was available, but not chosen, in the investigation.  SolarWorld Remand Comments

6–7.  As SolarWorld states, Commerce prioritizes "industry-specific data in a review but

program-specific data in an investigation."  Id. at 7.  Commerce has adequately explained

the reasoning behind the two different methodologies.  Using a rate in the first review that was available during the investigation does not undermine Commerce's logic. Commerce's preference for program specific data in investigations enables it to choose a relevant rate when the agency may lack knowledge sufficient to know which industry rates are representative of the program.

Additionally, SolarWorld argues that Commerce has failed to sufficiently explain why it weighs inducement more heavily in investigations than reviews, thus striking a different balance between inducement and relevancy.  SolarWorld Remand Comments 5–6.  However, Commerce explained why it chose the rates it did in the investigation and the review.  Remand Results 2–9.  When Commerce considers using a particular rate it considers three attributes of that rate: program relevancy, industry relevancy and inducement.  Commerce explains its concern that emphasizing industry relevance in investigations may sacrifice program relevancy and undermine inducement, because it will likely have fewer rates from which to choose.  Id. at 8, n.22.  Commerce explained this concern regarding industry data availability in investigations render industry relevancy a less valuable variable for investigations, and this difference causes Commerce to "strike the balance differently among these three variables."  Id. at 9.

Finally, SolarWorld argues that adherence to a strict hierarchy is unreasonable, and that Commerce should instead adapt to the specific situation in each case to avoid the "absurd result" here of lowering the AFA rate from the investigation to the review.[12]

_____

[12] SolarWorld emphasizes that the use of a hierarchy system in this case "had the absurd result of lowering the AFA rate despite the GOC's repeated and continued refusal to cooperate," noting

(footnote continued)

SolarWorld Remand Comments 7.  SolarWorld suggests that this hierarchy did not lead

to the best AFA rate here because the rate dropped from the investigation to the review.

Id.  The use of different methodologies, which the court finds reasonably explained, in

investigations and reviews may reasonably result in different rates.  It is possible that the

original rate did not reflect the most relevant or representative rate.  With more information

available in the review, Commerce may be able to achieve a more representative rate

reflective of the non-cooperating company's subsidization experience.  The court

assesses the methodology for reasonableness and for sufficient explanation of the

reasoning underlying the approach.  Given the different circumstances that exist in

investigations and reviews, the different approaches are reasonable.  Although it could

be argued that a case-by-case hierarchy system also would be reasonable, that possibility

does not make Commerce's hierarchy structure unreasonable.  Commerce is entitled to

devise a methodology to apply to all cases and the court cannot say that this methodology

is unreasonable in general or as applied here.

## CONCLUSION

For the foregoing reasons, the results of Commerce's remand determination in the

first administrative review of the CVD order covering crystalline silicon photovoltaic cells,

whether or not assembled into modules, from the People's Republic of China are found

to comply with the court's remand order in SolarWorld I, 40 CIT at __, 181 F. Supp. 3d at

---

that "[a] lower AFA rate simply does not have any deterrent effect."  SolarWorld Remand Comments 7.  Although a higher rate would seemingly induce cooperation, it did not have that effect here; the Government of China continued to not cooperate in the first review.  See Final Decision Memo at 18, 33, 43–44.

Court No. 15-00232                                                                          Page 17

1381, and to be supported by substantial evidence and in accordance with law.

Therefore, the court sustains the Remand Results.  Judgment will enter accordingly.


                                                                      /s/ Claire R. Kelly
                                                                   Claire R. Kelly, Judge

Dated: June 7, 2017
          New York, New York